Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4355 | **DATE** | 9/5/2002 |
| **CASE TITLE** | HOUSEHOLD COMMERCIAL FINANCIAL SERVICE vs. WILLIAM SUDDARTH, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 9/20/02 at 9:30A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Plaintiff's motion for summary judgment as to Count I [11-1] is granted because the undisputed facts show that defendants breached the Guaranty and plaintiff suffered damages in the amount of $1,241,013.20. The Suddarths' cross-motion for summary judgment as to Count I [18-1] is denied. Plaintiff's motion to strike defendants' declaration [26-1] is stricken as moot and its motion to strike defendants' jury demand [24-1] is granted. Only Plaintiff's claim for conversion, Count II, remains for trial.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | Document Number |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | SEP 0 9 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 35 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | SEP 0 9 2002 | |
| | | | date mailed notice | |
| TBK | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HOUSEHOLD COMMERCIAL<br>FINANCIAL SERVICES INC.,<br>a Delaware corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>WILLIAM SUDDARTH, an individual, and<br>ANGELA SUDDARTH, an individual,<br><br>    Defendants, | 01 C 4355<br><br>Judge Ronald A. Guzmán |

## MEMORANDUM OPINION AND ORDER

In this diversity case, plaintiff Household Commercial Financial Services, Inc., ("Household") has sued defendants William Suddarth and Angela Suddarth ("the Suddarths") for breach of a personal guaranty agreement (Count I) and for conversion (Count II). Pending are the parties' cross motions for summary judgment as to Count I pursuant to FED. R. CIV. P. 56 as well as plaintiff's motions to strike defendants' declaration and jury demand. For the reasons set forth below, Household's motion for summary judgment as to Count I is granted and the Suddarths' cross motion is denied. Further, the Court strikes Household's motion to strike defendants' declaration as moot and grants its motion to strike defendants' jury demand as to the remaining claim for conversion (Count II).

## FACTS

American National Home Mortgage, Inc. ("ANHM") was a residential mortgage lender located in Nashville, Tennessee. On November 22, 1999, Household, a Delaware corporation, whose principal place of business is in Prospect Heights, Illinois entered into a Warehousing Line Revolving Credit Agreement ("Credit Agreement") with ANHM pursuant to which Household agreed to extend revolving credit to ANHM in the amount of $10,000,000. In

1

connection with the Credit Agreement, the parties also entered into a Revolving Credit Note and a Security Agreement both dated November 22, 1999.

As of September 20, 1999, Joseph Cleghorn, Sr. controlled and owned a majority of ANHM. In late December 1999 and early January 2000, the Suddarths, residents of Tennessee, negotiated a majority purchase of ANHM. Subsequently, Angela Suddarth assumed oversight of day-to-day operations. On March 8, 2000, Household and ANHM entered into a First Amendment to Credit Agreement and a Replacement Revolving Credit Note which increased the revolving credit commitment to $14,000,000. Defendants contend that plaintiff's agent Mike Hammond prevailed upon them to relinquish ANHM's other funding sources, assuring them that Household would fully meet all ongoing capital needs; plaintiff, however, disputes this.

In March 2000, defendants came to suspect that financial information provided to them prior to their purchase of ANHM stock failed to disclose that ANHM was in a problematic financial position. In June 2000, following a financial review and audit, defendants learned that ANHM was in default of its obligations to Household and notified Hammond of the situation. Hammond informed Angela Suddarth that the Credit Agreement prohibited ANHM from changing ownership without notifying Household and that the change in ownership constituted a default. Hammond requested that defendants provide resumés and an application for a warehouse line of credit so that Household could conduct due diligence to determine the wisdom of waiving the event of default.

After defendants submitted the documentation, Household continued to provide credit to ANHM. Hammond then sent defendants a (Second) First Amendment to Credit Agreement ("(Second) First Amendment") and a Replacement Revolving Credit Note increasing the revolving credit commitment to $17,000,000, which were subsequently executed on June 28, 2000. Defendants contend that Hammond told them that the amendment would remedy the ongoing default while Household processed their application for a new credit agreement and new credit line, as the old line had been extinguished by the change in ownership. Plaintiff counters that Hammond never discussed a new line of credit with defendants nor did any representative of Plaintiff tell them that the (Second) First Amendment only applied while the parties awaited approval of ANHM's

2

application for a new credit line.

Following execution of the (Second) First Amendment, Hammond observed increased aging in ANHM's credit line and requested that defendants sign a personal Guaranty Agreement ("the Guaranty"). Defendants contend that Hammond assured them that (1) the Guaranty was just a "formality," "routine paperwork" for the opening of a new credit line; (2) the old credit line would be closed; and (3) Household would allow ANHM's future business to repay its old debt. Plaintiff counters that Hammond never represented that the Guaranty was a mere formality or that execution would secure a new credit line, waive any terms of the Credit Agreement, or prevent Household from ever declaring ANHM in default.

Plaintiff asserts that in exchange for agreeing not to declare an immediate default against ANHM and continuing to extend credit to ANHM, defendants agreed to sign the Guaranty. On July 28, 2000, defendants signed the Guaranty; although the Guaranty states that the agreement is executed in favor of plaintiff, no representative signed on behalf of Household. The Guaranty provides in pertinent part:

> ...for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned hereby jointly and severally, unconditionally and irrevocably, as primary obligor and not merely as surety, guarantees the full and prompt payment when due, ... of all obligations (monetary or otherwise) of [ANHM] to the Lender under or in connection with the Credit Agreement, the Note, any Loan Document and any other documents or instrument executed in connection therewith, in each case however created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due (all such obligations collectively called the "Liabilities"); ... if any Event of Default shall occur under ... the Credit Agreement, ... such undersigned will pay to [Household] forthwith the full amount which would be payable hereunder by such undersigned if all Liabilities were then due and payable.

(Pl.'s Ex. B at 1.) Household continued to provide credit to ANHM, although no new credit line was ever created, until September 29, 2000, when ANHM failed to make payments required on the indebtedness of the Credit Agreement. On October 20, 2000, Household sent defendants a letter notifying them of the event of default, informing them that Household was terminating its commitment to make loans to ANHM and requesting that all obligations be immediately due and payable.

On November 2, 2000, ANHM filed for relief under Chapter 11 of the United States

Bankruptcy Code. On April 4, 2001, the Honorable George C. Paine II of the United States Bankruptcy Court for the Middle District of Tennessee granted an order providing in part that in conducting any sale of its collateral, Household would be entitled to enter a bid and could credit some or all of the indebtedness against its bid. On April 26, 2001, Household conducted a sale of the Household collateral pursuant to Section 9-504 of the Uniform Commercial Code. At the sale, Household entered a bid of $6,500,000 which was accepted. After applying the credit bid to the Household Indebtedness of $7,741,013.20, Household contends the remaining debt owed on the loan documents is $1,241,013.20.

When defendants did not make any payment to Household on the remaining debt, plaintiff commenced this action, on June 6, 2001, claiming breach of the Guaranty (Count I) and seeking the remaining debt. Plaintiff later amended its complaint to include a conversion claim (Count II) alleging that defendants caused ANHM not to transfer company cash collateral to Household in contravention of Judge Paine's order and seeking said cash collateral as payment in satisfaction of ANHM's indebtedness as well as punitive damages.

Household has moved, and defendants have cross moved, for summary judgment as to Count I. Defendants assert affirmative defenses arguing that: (1) they were fraudulently induced by Hammond into signing the Guaranty; (2) the Guaranty fails for want of consideration; (3) plaintiff breached its duty of good faith and fair dealing; and (4) that plaintiff failed to mitigate damages and as a result defendants contest plaintiff's debt calculation. Plaintiff suggests that the Guaranty is subject to the Illinois Credit Agreements Act ("ICAA") which bars a debtor from maintaining an action on or in any way related to a credit agreement unless such agreement is in writing and is signed by both the creditor and debtor. 815 ILL. COMP. STAT. 160/1 *et seq.* (1989). Plaintiff further argues that the express terms of the Guaranty defeat defendants' claim of failure to mitigate damages. Defendants argue that since the Guaranty was only signed by the debtors, the agreement does not fall within the bounds of the ICAA. Plaintiff has also moved to strike defendants' jury demand. Finally, plaintiff moves to strike defendants' declaration as lacking the personal knowledge required by FED. R. CIV. P. 56(e).

## DISCUSSION

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). This standard of review applies to cross motions for summary judgment. *Int'l Bhd. of Elec. Workers v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). The nonmovant must show through specific evidence that a triable issue of fact remains on the issues on which he bears the burden of proof at trial. *See Celotex*, 477 U.S. at 324. "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." *Chemsource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir. 1997). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Insolia v. Phillip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

Where, as here, jurisdiction is based on diversity of citizenship, the substantive rights of the parties are governed by state law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999). Although defendants dispute the validity of the Guaranty, which includes language stating that the Guaranty shall be construed in accordance with Illinois law, defendants have failed to suggest that the law of a state other than the forum state ought to apply and accordingly the forum state's law applies by default. *See ECHO, Inc. v. Whitson Co. Inc.*, 52 F.3d 702, 707 (7th Cir. 1995); *see also Kritikos v. Palmer Johnson, Inc.*, 821 F.2d 418, 421 (7th Cir. 1987) (holding that parties' failure to raise choice of law issue on appeal resulted in waiver of that issue). Therefore, it is the Court's duty to apply the law that it believes the Supreme Court of Illinois would apply if the case were brought before that tribunal rather than this Court. *See Brunswick Leasing Corp. v. Wis. Cent., Ltd.*, 136 F.3d 521, 527 (7th Cir. 1998). When the "state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." *Lexington*, 165 F.3d at 1090. It

is with these standards in mind that the Court addresses the instant motions.

## I. The ICAA

Household contends that the Suddarths' affirmative defenses, *i.e.*, fraudulent inducement, lack of consideration and breach of a duty of good faith and fair dealing, are barred by the ICAA because they rely on an alleged oral credit agreement between Hammond and defendants to extend ANHM a new line of credit. Defendants argue that Hammond fraudulently induced them to sign the Guaranty by promising that Household would extend ANHM a new cline of credit, forbear from declaring ANHM in default of its prior obligations, and allow ANHM to apply future profit to its existing debt. In addition, they allege that the Guaranty lacked adequate consideration because it only reaffirmed pre-existing duties and that Household breached its duty of good faith and fair dealing by falsely promising that Household would not withhold credit and then withdrawing credit and declaring ANHM in default.

Section 2 of the ICAA imposes special writing requirements on actions arising from a "credit agreement." The ICAA defines "credit agreement" as "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money not primarily for personal, family or household purposes, and not in connection with the issuance of credit cards." 815 ILL. COMP. STAT. 160/1. Section 2 of the ICAA provides:

> "Credit agreements to be in writing. A debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing, expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor."

815 ILL. COMP. STAT. 160/2. The ICAA's writing requirement is a strong form of the statute of frauds. *See Resolution Trust Corp. v. Thompson*, 989 F.2d 942, 944 (7th Cir. 1993); *McAloon v. Northwest Bancorp, Inc.*, 654 N.E.2d 1091, 1094 (Ill. App. Ct. 1995). The plain words of the statute prohibit a debtor from maintaining an action where the agreement is not in writing and signed by both parties; the ICAA, however, does not by its plain language place any restrictions on the actions of creditors. *See Help At Home Inc., v. Med. Capital, L.L.C.*, 260 F.3d 748, 756-

6

57 (7th Cir. 2001); *McAloon,* 654 N.E.2d at 1094.

Section 3 of the ICAA outlines the set of agreements that must satisfy Section 2's requirements in order for a debtor to maintain an action premised on the existence of a new credit agreement. Section 3 of the ICAA provides in relevant part:

> Actions not considered agreements. The following actions do not give rise to a claim, counter-claim, or defense by a debtor that a new credit agreement is created, unless the agreement satisfies the requirements of Section 2:
>
> ... (3) the agreement by a creditor to modify or amend an existing credit agreement or to otherwise take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies in connection with an existing credit agreement, or rescheduling or extending installments due under an existing credit agreement.

815 ILL. COMP. STAT. 160/3. The Court notes, at the outset, that the term "Actions" encompasses the procedural device of affirmative defenses. *Teachers Ins. & Annuity Ass'n of Amer. v. LaSalle Nat'l Bank,* 691 N.E.2d 881, 886-88 (Ill. App. Ct. 1998) (finding that debtor's affirmative defenses are actions barred by Section 3 when based on alleged oral credit agreement); *see also Whirlpool Fin. Corp. v. Sevaux,* 96 F.3d 216, 225 (7th Cir. 1996) (concluding that debtor's assertion that counterclaims are not "actions" within meaning of ICAA is wholly without merit).

The ICAA bars all actions that are in any way related to an alleged credit agreement, whether those actions sound in contract or tort. *See Nordstrom v. Wauconda Nat'l Bank,* 668 N.E.2d 586, 588 (Ill. App. Ct. 1996); *McAloon,* 654 N.E.2d at 1095; *First Nat'l Bank v. McBride Chevrolet, Inc.,* 642 N.E.2d 138, 142 (Ill. App. Ct. 1994). It also bars traditional exceptions to the statute of frauds, such as fraud, part performance, and equitable estoppel. *See Whirlpool,* 96 F.3d at 226. Indeed, "there is no limitation as to the type of actions by a debtor which are barred by the [ICAA], so long as the action is in any way related to a credit agreement." *First Nat'l,* 642 N.E.2d at 142.

A threshold inquiry concerns whether a guaranty is contained within the ICAA's definition of a credit agreement. Illinois courts have found that where a guaranty agreement forms an integral part of a loan, it should not be viewed in isolation from the underlying loan but

7

rather in connection with other loan documents, and thus the guaranty agreement constitutes a credit agreement for purposes of the ICAA. *Bank One v. Roscetti*, 723 N.E.2d 755, 762-63 (Ill. App. Ct. 1999) (concluding that Illinois courts' consideration of whether guarantor's defenses based on oral promises was modification of entire loan, rather than merely guaranty, despite fact that lender had sued on guaranty, indicates recognition that guaranty is one of several documents constituting credit agreement); *see also Finova Capital Corp. v. Slyman*, No. 01 C 6244, 2002 WL 318294, at *3 (N.D. Ill. Feb. 25, 2002) (stating that personal guaranty is credit agreement under terms of ICAA).

Here, the Guaranty makes specific reference to the Credit Agreement as well as defendants' obligations thereunder should a default arise. The Guaranty forms an integral part of Household's continued extension of credit to ANHM given the execution of the (Second) First Amendment and the Replacement Revolving Credit Note, signed by Angela Suddarth, expanding the warehouse line from $14,000,000 to $17,000,000 a month prior. *See Bank One*, 723 N.E.2d at 763 (recognizing that documents comprising credit agreement are often conditioned upon each other such that default under one creates default under all). Therefore, the Court finds that the Guaranty falls within the scope of Section 1 of the ICAA.

Defendants contend that because the Guaranty is signed only by the Suddarths, it fails the signature requirement of the ICAA. However, the plain words of Section 2 of the ICAA state only that a debtor may not maintain an action unless the alleged credit agreement is signed by the creditor and the debtor.[1] *See Help At Home*, 260 F.3d at 756-57 (noting that assertion that both

---

[1] The language of the ICAA concerning its signature requirement provides the only guidance as to the framer's intent, for, as the Seventh Circuit has noted, the act has no usable legislative history. *Resolution Trust Corp.*, 989 F.2d at 944. Further, a review of similar statutes in other states provides no settled doctrine to guide our inquiry. For instance, Minnesota's credit agreements statute, MINN. STAT. § 513.33 (West 1991), defines "signed" as including any symbol adopted by a party with intent to authenticate a writing cannot be reconciled with Illinois jurisprudence. *Compare Rural Amer. Bank of Greenwald v. Herickhoff*, 485 N.W.2d 702, 706 (Minn. 1992) (indicating that complete signature is not necessary and that authentication may take form of print, stamp, initials or thumbprint), *with McAloon*, 654 N.E.2d at 1094 (stating that loan agreement that contained only creditor's initials was insufficient to meet requirements of ICAA). Colorado's statute appears to follow the common law requiring only that "the credit agreement is in writing and is signed by the party against whom enforcement is sought," COLO. REV. STAT. § 38-10-124 (1989). Washington's statute provides that a credit agreement is not enforceable against the creditor unless the agreement is in writing and signed by the creditor. WASH. REV. CODE § 19.36.110 (West 1990). The terms of Colorado's and Washington's statutes diverge from the express language of Section 2 of the ICAA, which requires the signature of both the creditor and the debtor.

8

parties must sign all documents for debtor to assert credit agreement may be more consistent with express terms of ICAA); *McAloon*, 654 N.E.2d at 1094 (holding that debtor could not maintain breach of contract claim based on written loan proposal that creditor had initialed in absence of allegation that debtor had also signed proposal). Further, in *Finova Capital Corp.*, where, as here, a creditor sued a debtor for breach of a personal guaranty, when the debtor offered a trust agreement that only the debtor had signed as altering the initial credit arrangement, that court concluded "because the trust and assignment agreement is not signed by the creditor . . . , as well as the debtors, §§ 2 and 3 of the ICAA bar [debtors] from asserting a defense based on its content. Thus [debtors] cannot use the terms of the trust and assignment agreement as a basis for an affirmative defense against [creditor's] claims." *Finova Capital Corp.*, 2002 WL 318294, at *4. The effect of the terms of the ICAA in the instant case is to allow Household to assert the Guaranty, signed only by the Suddarths offensively. However, Illinois courts have repeatedly emphasized that the ICAA is a broad statute that will be applied the way it was written, even though the results of that application may at times seem harsh. *Mach. Transps. of Ill. v. Morton Cmty. Bank*, 687 N.E.2d 533, 535-36 (Ill. App. Ct. 1997); *McAloon*, 654 N.E.2d at 1095-96; *First Nat'l*, 642 N.E.2d at 142.

Additionally, while the terms of the Guaranty reference the Credit Agreement and other documents pertaining to the parties' credit relationship, neither party has raised the issue of whether multiple documents may be aggregated to satisfy the ICAA's signature requirement and the Court therefore declines to address this question. *Cf. Help At Home*, 260 F.3d at 756 (declining to resolve this question of state law and emphasizing that document at issue had insufficient connection to rest of parties' agreements to demonstrate intent to contract). Therefore, the Court finds that the ICAA, by its plain language, does not bar Household's claim against defendants.

Finding that defendants have not satisfied the requirements of Section 2, the Court turns to the question of whether defendants' specific affirmative defenses are barred by the ICAA. Here, the Suddarths assert that they were fraudulently induced into signing the Guaranty by

9

Hammond's oral promises to extend ANHM a new line of credit, extinguish the old line of credit, allow ANHM to apply future profits to past debts, and forbear from declaring ANHM in default. Unfortunately for defendants, these contentions fit squarely within the language of Section 3 of the ICAA; they tend to show the agreement by a creditor to enter into a new credit agreement and to forbear from exercising remedies in connection with an existing agreement and therefore do not give rise to a defense. *See Whirlpool*, 96 F.3d at 226 (barring debtor's six affirmative defenses including fraudulent inducement). Likewise, defendants' defense based on failure of consideration is barred by the ICAA.[2] *Id.* (barring debtor's affirmative defenses pleading failure and want of consideration).

In connection with Hammond's alleged oral modifications to the Credit Agreement, defendants also assert a breach of the implied duty of good faith and fair dealing. Every contract implies good faith and fair dealing between the parties to it. *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 690 (Ill. 1958). Good faith requires the party vested with contractual discretion to exercise it reasonably, and he may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. *Carrico v. Delp*, 490 N.E.2d 972, 976 (Ill. App. Ct. 1986). Courts are divided on the question of whether the ICAA bars this particular defense. *Compare Help At Home*, 260 F.3d at 757 (citing *First Nat'l*, 642 N.E.2d at 142 and dismissing counterclaim for breach of implied duty of good faith and fair dealing for failure to comply with ICAA), *and Whirlpool*, 96 F.3d at 226 (same), *and Gen. Elec. Capital Corp. v. Donogh Homes, Inc.*, No. 93 C 5614, 1993 WL 524814, at *3-6 (N.D. Ill. Dec. 15, 1993) (holding counterclaims including breach of good faith and fair dealing are barred by ICAA), *with Finova Capital*, 2002 WL 318294, at *7-8 (treating debtor's affirmative defense of

---

[2] The Court recognizes that under Illinois law where, as here, a guaranty is executed after the guaranteed debt is incurred, new consideration is necessary to support the guaranty. *City Nat'l Bank of Hoopeston v. Russell*, 615 N.E.2d 1308, 1312 (Ill. App. Ct. 1993). Forbearance from exercising a right to take legal action against a third party constitutes adequate consideration for the guaranty of a debt obligation. *Town & Country Bank v. E&D. Bancshares, Inc.*, 527 N.E.2d 637, 642 (Ill. App. Ct. 1988). To constitute consideration for a guaranty, an agreement to forbear need not be in express terms or for an exact period of time. *Id.* at 642. Therefore, even under defendants' characterizations in their affirmative defenses [doc. no. 10-1] where they state that they signed the Guaranty only on the condition that plaintiff agreed to continue funding ANHM's business operations and on the additional condition that plaintiff would not declare ANHM to be in default, the Guaranty was supported by adequate consideration in the form of Household's forbearance.

breach of covenant of good faith and fair dealing separately from defenses barred by ICAA and recognizing that agreements signed by parties included implied duty of good faith and fair dealing); *and Bank One*, 723 N.E.2d at 763-67 (examining allegation of breach of good faith and fair dealing under "even if the [ICAA] applies" assumption). Since the Seventh Circuit decisions in *Help at Home* and *Whirlpool* are binding authority on this Court, and in those cases the Courts held that claims of breach of an implied duty of good faith and fair dealing were barred by the ICAA, this Court also holds that such a defense is barred by the ICAA.

**II. Duty to Mitigate**

Defendants further allege that Household failed to mitigate damages by promptly taking over ANHM defaulted loans or approving loans pending at the time of default. Defendants, however, failed to brief this issue and plaintiff addressed it in terms of contractual interpretation rather than under the ICAA. As a result, this Court approaches the issue as one of application of contractual terms under Illinois law. The Suddarths submit that mitigation of damages would have substantially reduced the outstanding $1,241,013.20 that Household claims here. The duty to mitigate damages imposes a duty on the injured party to "exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted." *Amalgamated Bank of Chicago v. Kalmus & Assocs., Inc.*, 741 N.E.2d 1078, 1086 (Ill. App. Ct. 2000).

Plaintiff argues that, by the terms of the Guaranty, defendants have waived this defense. Specifically, plaintiff points to the language of the Guaranty:

> Each of the undersigned hereby expressly waives: . . . (d) all diligence in collection or protection of or realization upon any Liabilities or any security for or guaranty of any Liabilities . . . . No delay on the part of the Lender in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy . . . .

(Pl.'s Ex. B at 1.) Under Illinois law, a guaranty is a contract and should be interpreted according to the standards that govern the interpretation of contracts in general. *Blackhawk Hotel Assocs. v. Kaufman*, 421 N.E.2d 166, 168 (Ill. 1981); *T.C.T. Bldg. P'ship v. Tandy Corp.*, 751 N.E.2d

11

135, 139 (Ill. App. Ct. 2001). Contracts are enforced according to their terms under Illinois law and therefore guaranties are to be interpreted in accordance with their clear and unambiguous language. *Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 577 (7th Cir. 1995). Illinois courts generally enforce clear and unambiguous waivers of defenses contained in guaranties. *Donogh Homes*, 1993 WL 524814, at *5; *BA Mortgage & Int'l Realty Corp. v. Am. Nat'l. Bank & Trust Co.*, 706 F. Supp. 1364, 1376 (N.D. Ill. 1989)).

The express language of the Guaranty clearly waives all diligence on the part of Household in the collection of outstanding liabilities. To now claim that defendants may assert defenses premised on Household's delay in performance "flies directly in the face of [the] Guaranty." *BA Mortgage*, 706 F. Supp. at 1376. Further, in its response to plaintiff's statement of undisputed facts paragraphs 23 and 24, defendants fail to cite any portion of the record to support their contention that Household could have entered a bid in the full amount of the alleged indebtedness at the sale of Household Collateral or their assertion that Household's calculation of ANHM's indebtedness, $1,241,013.20, is inaccurate. The statements of fact in Household's paragraphs 23 and 24 are therefore deemed admitted because they were not properly controverted. Local Rule 56.1(b), which the Court strictly enforces, provides that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Am. Nat'l Fire Ins. Co. v. Abrams*, No. 99 C 5807, 2002 WL 243455, at *1 n.2 (N.D. Ill. Feb. 19, 2002); *see also Wienco, Inc. v. Katahn Assocs., Inc.*, 965 F.2d 565, 567 (7th Cir. 1992) (noting Circuit's strict enforcement of LR 12(N), which is now LR 56.1).

As a result of the foregoing discussion, the Suddarths defenses are either barred by the ICAA or by the express language of the contract and as such no dispute of any material fact remains with regard to Count I. Further, the undisputed facts before this Court establish that the Guaranty is a valid contract and that the amount defendants owe to Household is $1,241,013.20. Therefore, Household's motion for summary judgment as to Count I is granted, defendants' cross motion is denied, and plaintiff's motion to strike defendants' declaration is stricken as moot.

## III. Motion to Strike Jury Demand

Because Count II still remains, the Court must consider Household's motion to strike defendants' jury demand. Plaintiff argues that by the express terms of the Guaranty defendants' have waived their right to a jury trial. If a document is signed by the party being charged, the other party's signature is not necessary if the document is delivered to that party and she indicates acceptance through performance. *Meyer & Meyer Photography, Inc. v. Miglin, Inc.*, 652 N.E.2d 1233, 1239 (Ill. App. Ct. 1995). Further, Illinois law states that if the contract terms are unambiguous, the parties' intent must be ascertained exclusively from the express language of the contract, as a matter of law. *See id.* at 1238. Here, defendants signed the Guaranty, and plaintiff performed by continuing to extend credit to ANHM for nearly three months. Because defendants' failure of consideration defense is barred by the ICAA and because the Guaranty is supported by adequate consideration, this Court follows Illinois law and will enforce the unambiguous terms of the jury waiver.

Although the right to a jury trial in civil cases is guaranteed by the Seventh Amendment, like some constitutional rights, it may be waived. *Cf. D.H. Overmyer Co. Inc. v. Frick Co.*, 405 U.S. 174, 187 (1972) (contractual waiver of pre-judgment notice and hearing not violative of Fourteenth Amendment). The question whether the right has been waived is governed by federal rather than state law even in diversity cases. *Bonfield v. AAMCO Transmissions, Inc.*, 717 F. Supp. 589, 594-95 (N.D. Ill. 1989) (citing *Simler v. Conner*, 372 U.S. 221, 222 (1963)). However, the circuits are split on whether the party asserting the validity of a contractual jury waiver bears the burden of proof as to whether the waiver was knowingly and voluntarily executed. *See Pierce v. Atchison Topeka & Santa Fe Ry. Co.*, 110 F.3d 431, 435 n.4 (7th Cir. 1997). *Compare Leasing Serv. Corp. v. Crane*, 804 F.2d 828, 833 (4th Cir. 1986) (agreeing with those courts that have held that party seeking enforcement of waiver bears burden of proving consent), *with K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752, 758 (6th Cir. 1985) (placing burden of proving that consent was secured unknowingly and involuntarily on objecting party).

While the Seventh Circuit has not addressed this issue, it is unnecessary for this Court to

13

do so because irrespective of which party carries the burden of proof and whatever the applicable standard, it is clear that the Suddarths voluntarily waived this right. *See Bonfield*, 717 F. Supp. at 595. Examination of the Guaranty reveals just how clear the waiver provision was. The waiver language stands out from the majority of the document in that it appears in all caps and in boldface type: "**EACH OF THE UNDERSIGNED, AND LENDER, HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS GUARANTY . . . .**" (Pl.'s Ex. B at 5); *see In re Reggie Packing Co.*, 671 F. Supp. 571, 573-74 (N.D. Ill. 1987) (upholding jury waiver provision where language was located directly above signature). While the Suddarths' claim that they each signed but did not read the Guaranty, instead relying on the review and approval of the other, both claim that ANHM's chief executive officer, an individual with years of experience in the mortgage industry reviewed the documentation. In any event, the failure to read an agreement provides defendants no relief from the application of a jury waiver provision. *See ARH Distribs., Inc. v. ITT Commercial Fin. Corp.*, No. 87 C 511, 1988 WL 17628, at *2 (N.D. Ill. Feb. 19, 1988) (enforcing jury waiver provision despite evidence that party seeking to avoid waiver did not read contract prior to signing); *see also Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1292 (7th Cir. 1989) ("basic contract law establishes a duty to read the contract; it is no defense to say, 'I did not read what I was signing.'") Further, having previously owned and operated several companies the Suddarths were not inexperienced business persons and were not prevented from having counsel review the Guaranty, though they chose not to exercise this option. *See Mellon Bank v. Miglin*, No. 92 C 4059, 1993 WL 281111, at *12 (N.D. Ill. Apr. 29, 1993) (enforcing waiver provision and noting that courts should be circumspect in helping any, but the most unsophisticated parties, where they have not read their contracts well). Therefore the language of the Guaranty is binding and this Court will enforce the jury waiver provision. Moreover, as the waiver covers "any financing relationship existing in connection with any of the foregoing [agreements]," the waiver applies equally to the conversion count. (Pl.'s Ex. B at 5.)

## CONCLUSION

For the foregoing reasons, Household's motion for summary judgment as to Count I [doc. no. 11-1] is granted because the undisputed facts show that defendants breached the Guaranty and plaintiff suffered damages in the amount of $1,241,013.20. The Suddarths' cross-motion for summary judgment as to Count I [doc. no. 18-1] is denied. Household's motion to strike defendants' declaration [doc. no. 26-1] is stricken as moot and its motion to strike defendants' jury demand [doc. no. 24-1] is granted. Only Household's claim for conversion, Count II, remains for trial.

**SO ORDERED**                                ENTERED:   9-5-02

_____
HON. RONALD A. GUZMAN
United States Judge